IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| GEORG GARNITSCHNIG, <br> Plaintiff, <br><br> v. <br><br> ZOLA HOROVITZ, *et al.*, <br> Defendants. | Civil Action No. 12-cv-00774-AW |

## MEMORANDUM OPINION

Pending before the Court is Plaintiff Georg Garnitschnig's Motion for Preliminary Injunction. Doc. No. 12. A motion hearing was held on November 15, 2013. The Court ruled at the close of the hearing that Plaintiff's Motion would be denied. This Memorandum Opinion supplements the Court's oral ruling.

### I. BACKGROUND

A. Factual Background

GenVec Inc., a Delaware corporation, is a biopharmaceutical company that works with other companies and the U.S. Government to leverage its proprietary gene-delivery technologies to address prevention and treatment of significant health concerns. From 2004 through 2010, GenVec's leading product candidate was TNFerade, a novel product intended to treat patients with cancer. On March 29, 2010, GenVec announced that it was discontinuing its clinical trial for the product because interim results suggested that the product would not obtain FDA approval. After the announcement, GenVec's stock price dropped by more than 72%. This led to the filing of a securities class action in addition to the pending lawsuit. Judge Chasanow

dismissed with prejudice the securities class action on September 20, 2013. *Shah v. GenVec, Inc.*, No. DKC 12-0341, 2013 WL 5348133 (D. Md. Sept. 20, 2013).

In early 2011, following the announcement that its clinical trial for TNFerade would cease, GenVec began planning a reverse stock split that would increase the share price of its common stock in order to comply with NASDAQ listing standards. Swirsky Dec., Doc. No. 17-2 ¶ 6. GenVec's stockholders approved a one-to-ten reverse stock split on April 5, 2011. *Id.* The pending dispute revolves largely around the GenVec Board of Directors' adoption of the 2011 Omnibus Incentive Plan ("the Plan") during the same period in which it considered and passed the reverse stock split. The final Plan—approved by the Board on April 21, 2011—provided the following:

> **6.2.   Limitation on Shares of Stock Subject to Awards and Cash Awards.**
>
> During any time when the Company has a class of equity securities registered under Section 12 of the Exchange Act:
>
>    (a) the maximum number of shares of Stock subject to Options or SARs [stock appreciation rights] that may be granted under the Plan in a calendar year to any person eligible for an Award under Section 6 is 250,000 shares ["option awards"];
>
>    (b) the maximum number of shares of Stock that may be granted under the Plan, other than pursuant to Options or SARs, in a calendar year to any person eligible for an Award under Section 6 is 120,500 shares ["restricted stock awards"].

Doc. No. 17-2 ¶ 11; Doc. No. 17-2 Ex. A. The Plan also provided the following:

> **5.3. Amendment and Termination.**
>
> The Board may, at any time and from time to time, amend, suspend or terminate the Plan as to any shares of Stock to which Awards have not been made. The effectiveness of any amendment to the Plan shall be contingent on approval of such amendment by the Company's shareholders to the extent provided by the Board or required by Applicable Laws (including the rules of any Stock Exchange on which the Stock is then listed) . . . .

Doc. No. 17-2 Ex. A.

As the Plan was being prepared, an "incorrect adjustment" was made in the numbers for annual per-participant awards. Doc. No. 17-2 ¶ 9. Specifically, these amounts were reduced on roughly the same one-for-ten basis that mirrored the reverse stock split under consideration during the same time period. *Id.* The unapproved draft provided that the maximum award under § 6.2(a) was 25,000, while the maximum award under § 6.2(b) was 12,500. *Id.* ¶ 10. The error was identified before the Plan was submitted to the Board, however, and the Board approved the 250,000 and 120,500 limits. *Id.* ¶ 11.

On April 29, 2011, GenVec issued its 2011 Proxy Statement. *Id.* ¶ 12; Doc. No. 11-2. Due to a "miscommunication," the 2011 Proxy Statement included the numbers from the unapproved draft of the Incentive Plan (25,000 and 12,500), rather than the numbers actually approved by the Board (250,000 and 120,500). Doc. No. 17-2 ¶ 12. The unapproved draft was also "mistakenly" attached to the 2011 Proxy Statement. *Id.* Otherwise, the draft incentive plan attached to the 2011 Proxy Statement was identical to the one actually approved by the Board. For example, the 2011 Proxy Statement, which was approved by GenVec's shareholders, accurately disclosed that the Plan provided for an aggregate award total of 300,000 shares plus the number of shares of common stock available under the 2002 Incentive Plan. Doc. No. 11-2 at 34, 53-54. The 2011 Proxy Statement also disclosed that "[t]he Board of Directors may terminate or amend the Plan at any time for any reason." *Id.* at 35. Finally, the 2011 Proxy Statement included the relevant language on amendment and termination from Section 5.3 of the Board-approved 2011 Incentive Plan. *Id.* at 54.

The 2011 Proxy Statement also explained that the award limits were adopted so that the company would have the option going forward of qualifying for tax deductions under the Internal Revenue Code, 26 U.S.C. § 162(m). *See id.* at 25-26. The provision allows a

3

corporation to deduct compensation to certain covered employees up to $1,000,000/year. *Id.* § 162(m)(1). However, performance-based compensation issued pursuant to an incentive plan—such as the 2011 Incentive Plan adopted by GenVec's Board—is not used in calculating whether compensation exceeds $1,000,000. *Id.* § 162(m)(4). Defendant and current President and CEO Douglas Swirsky explains that GenVec is in a precarious financial situation with $200 million in operating losses and that it does not expect to have taxable income at any point in the foreseeable future. Doc. No. 17-2 ¶ 5. Therefore, it has no need to deduct qualified performance-based compensation. *Id.* The company was primarily concerned with encouraging key employees to remain, and the only way to meet that challenge was through equity awards. *Id.* ¶ 4.

GenVec's 2012 Proxy Statement was issued on May 31, 2012. *See* Doc. No. 11-3. The 2012 Proxy Statement asked shareholders to approve an amendment to increase the aggregate number of shares awardable under the Plan by 640,000 shares. *Id.* at 46. The 2012 Proxy Statement contained the same inaccurate annual per-participant limits (25,000 and 12,500) contained in the 2011 Proxy Statement and unapproved draft incentive plan. *Id.* at 38. The 2012 Proxy Statement also continued to state that "[t]he Board may terminate or amend the 2011 Plan at any time and for any reason." *Id.* at 35. Stockholders approved the aggregate increase on July 11, 2012, with approximately 85% of shares voting in favor of the proposal.[1]

GenVec has experienced significant financial trouble since announcing that its clinical trial for TNFerade would cease. Early in 2013, the Board of Directors adopted a Plan of Complete Liquidation and Dissolution. Doc. No. 17-2 ¶ 3. The liquidation plan has since been

---

[1] *See* July 11, 2012 GenVec., Inc. Form 8-K, *available at* http://www.sec.gov/Archives/edgar/data/934473/000114420412039747/v318760_8k.htm. The Court may take judicial notice of the contents of public S.E.C. filings. *See, e.g.*, *In re Mun. Mortg. & Equity, LLC, Secs. & Derivative Litig.*, 876 F. Supp. 2d 616, 626 n.7 (D. Md. 2012); *In re Humphrey Hospitality Trust, Inc. Secs. Litig.*, 219 F. Supp. 2d 675, 684 n.5 (D. Md. 2002).

withdrawn, but the company has reduced its operating costs substantially and is pursuing an alternate business strategy under new leadership. *Id.*

On October 16, 2013, GenVec issued its 2013 Proxy Statement, the subject of Plaintiff's Motion for Preliminary Injunction. *See* Doc. No. 11-5. The 2013 Proxy Statement corrected the errors from the 2011 and 2012 Proxy Statements and correctly identified the annual per-participant award limits from the Board-approved 2011 Incentive Plan (250,000 and 120,500). *Id.* at 29. It also attached the Board-approved version of the Plan. *Id.* at 49.

It does not appear to be disputed that during 2012 and 2013, the Compensation Committee of the GenVec Board granted awards in excess of the per-participant limits contained in the 2011 and 2012 Proxy Statements and the unapproved draft Incentive Plan. These included the following: (1) January 18, 2012 option awards to Defendants Fischer, Swirsky, Brough, and Butman in excess of 25,000; (2) January 22, 2013 option awards to Defendants Swirsky, Brough, and Butman in excess of 25,000; (3) a January 23, 2013 option award to Defendant Collins in excess of 25,000; (4) September 3, 2013 restricted stock awards to Defendant members of the Compensation Committee and Defendant Horovitz in excess of 12,500; and (5) September 3, 2013 restricted stock awards to Butman, Swirsky, and Brough in excess of 12,500. Doc. No. 11 ¶¶ 35-36, 41-43. According to Plaintiff, the Board granted a total of 630,000 option awards and 612,500 restricted stock awards in excess of the stockholder-approved annual per-participant limits. Doc. No. 12-1 at 1.

It also does not appear to be disputed that the Compensation Committee's September 3, 2013 awards to Swirsky and Brough exceeded the per-participant annual limit for restricted stock (120,500) that had actually been approved by the Board in the 2011 Incentive Plan. Specifically, the Committee granted 200,000 shares of restricted stock to Swirsky upon his appointment as President and CEO and 125,000 shares of restricted stock to Brough. Doc. No. 17-2 ¶ 14. The

5

grants came at a time of turmoil for GenVec, as the Board had determined that Swirsky and Defendant Collins, the former President and CEO, were going to leave the company, that the company was unlikely to obtain stockholder approval for its liquidation and dissolution plan, and that regardless of the strategy pursued by the company, its shareholders would receive little value for their stock. *Id.* In light of these circumstances, the Board determined that it had to act promptly to encourage Swirsky to remain at the company as President and CEO and to retain Brough, the company's principal scientist and an individual vital to its business interests. *Id.* ¶ 15. The Board established a vesting date with the restricted stock grants that was two years following the grant date. *Id.* ¶ 16. According to Swirsky, the Board was not concerned with the deductability of the value of these grants at some future date when GenVec's earnings, rather than its losses, could reasonably be contemplated. *Id.* The grants were disclosed on GenVec's Form 8-K, which was filed with the S.E.C. on September 5, 2013 with respect to Swirsky, and on a Form 4 filed on behalf of Brough. *Id.*

GenVec's annual meeting is scheduled for November 22, 2013 at 8:30 a.m. Stockholders will have an opportunity to vote on three separate proposals: (1) electing Defendants William Kelley and Zola Horovitz to the Board; (2) amending the Incentive Plan to increase the aggregate number of awardable shares by 500,000 and "to approve material terms for payment of performance-based compensation under the 2011 Plan" for purposes of 26 U.S.C. § 162(m); and (3) ratifying the appointment of an auditor. Doc. No. 11-5 at 2. The record date for the meeting has been set and copies of the 2013 Proxy Statement have been mailed to stockholders. Three of GenVec's largest stockholders, who represent approximately 14.6% of GenVec's common stock, have submitted declarations that they are opposed to postponement of the 2013 annual meeting

and that additional disclosures regarding alleged violations of per-participant limits would have no impact on their voting decisions.[2] Doc. Nos. 17-3, 17-4, and 17-5.

Plaintiff Georg Garnitschnig, derivatively on behalf of GenVec and individually on behalf of himself and other stockholders, seeks to enjoin the November 22 annual meeting unless and until material omissions and false and misleading statements in the company's October 16, 2013 Proxy Statement are cured. Specifically, Plaintiff argues that the 2013 Proxy Statement does not disclose that the Board has granted GenVec's directors and officers awards in excess of the limits approved by stockholders in the 2011 and 2012 Proxy Statements, which leads stockholders to believe that the Board has adhered to the terms of the 2011 Incentive Plan. Plaintiff contends that the Board should disclose this information to stockholders before they vote to increase the aggregate number of awardable shares and before they vote to elect Kelley and Horovitz, both of whom were recipients of excess annual awards, to the GenVec Board.

B. Procedural History

Plaintiff originally filed this action on March 12, 2012. Almost immediately, the parties requested that the case be stayed pending the outcome of motions to dismiss that were going to be filed in the related case before Judge Chasanow. Doc. No. 3. The Court granted the Joint Motion to Stay on April 5, 2012. Doc. No. 5. Judge Chasanow made her relevant rulings on September 20, 2013, and on October 2, 2013, the parties in this case requested a lifting of the stay and the setting of deadlines to file an amended complaint and a motion to dismiss. Doc. No. 9. On November 1, 2013, Plaintiff filed his Amended Complaint in addition to the pending Motion for Preliminary Injunction. Doc. Nos. 11, 12. The Motion has been fully briefed and the parties appeared for oral argument on November 15, 2013.

---

[2] According to Defendants' opposition brief, these stockholders together with GenVec's directors and officers represent approximately 20.1% of the company's common stock. Doc. No. 17 at 13.

## II. ANALYSIS

A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (1998). Whereas the Fourth Circuit previously depended on the "flexible interplay" of the factors, the *Winter* Court "articulates four requirements, each of which must be satisfied as articulated." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). The Court will address each of these factors in turn.

### A. Likelihood of Success on the Merits

Directors of Delaware corporations "are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1277 (Del. 1994).[3] A fact is material is there is a "substantial likelihood" that its disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see also Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001). This standard "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote." *TSC Indus.*, 426 U.S. at 449. Rather, the standard contemplates "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* The Court concludes based on the record before it that the Board's prior awards in excess of the stockholder-approved annual per-participant limits would

---

[3] The parties are in agreement that because GenVec was incorporated in Delaware, Delaware corporate law applies to this action.

not have been viewed by the reasonable investor as having significantly altered the total mix of information made available. The omission of this information from the 2013 Proxy Statement does not appear to be material for at least the following reasons.

First, the Board was authorized by Section 5.3 of the Incentive Plan to amend, suspend, or terminate the Plan "as to any shares of Stock to which Awards have not been made," subject to applicable law, including the rules of a relevant stock exchange. Doc. No. 17-2 Ex. A. This provision of the Plan was correctly attached to the 2011 and 2012 Proxy Statements, and approved by shareholders. Furthermore, the 2011 and 2012 Proxy Statements explicitly provided that "[t]he Board of Directors may terminate or amend the Plan at any time for any reason." Doc. No. 11-2 at 35; Doc. No. 11-3 at 35. Plaintiff argued during the motion hearing that despite having the authority to do so, the Board *did not amend* the Incentive Plan. However, at this stage of the proceedings, the Court has not been tasked with determining whether the Plan was actually amended and whether such amendment was improper. Rather, the Court is tasked with assessing whether the Board's past grants of awards in excess of annual per-participant limits would be a material consideration for shareholders in voting to increase the aggregate limit and in voting to elect individuals to the Board. Given the shareholders' broad grant of authority to the Board to amend the Plan, the Court is not convinced that past awards in excess of per-participant limits would assume actual significance in the deliberations of the reasonable shareholder.

Second, although the Board's awards to individuals in 2011 and 2012 exceeded the shareholder-approved, annual per-participant limits, the Board never exceeded the aggregate award limits approved by shareholders. Therefore, there was no unauthorized dilution of GenVec's shares. Indeed, the shareholders voted in 2011 and 2012 to increase the number of aggregate awardable shares under the Plan. NASDAQ, the exchange on which GenVec's stocks

have been listed at all relevant times, recognizes the important distinction between aggregate limits and per-participant limits. NASDAQ Rules generally require stockholder approval when an equity compensation plan is "materially amended." *See* NASDAQ Rule 5635(c).[4] A recent NASDAQ Staff Interpretation concluded that an amendment to the limits on individual equity awards would not be "a material amendment" under NASDAQ Rules. NASDAQ Staff Interpretation Letter 2007-28 (July 31, 2012).[5] The Interpretation emphasized that such an amendment would neither increase the aggregate award limits nor expand the class of participants or the types of awards available, and thus, shareholder approval would not be required. *Id.* The Court is persuaded by NASDAQ's approach.[6]

Furthermore, the Court has been presented with no Delaware authority suggesting that prior awards in excess of individual per-participant limits would assume actual significance to a reasonable shareholder voting to increase *aggregate* awards or to elect directors.[7] Rather, it appears just as likely that reasonable shareholders would view the excess per-participant awards as a proper exercise of the Board's business judgment at a tumultuous time when the company needed to retain essential employees. *See, e.g.*, Doc. No. 17-2 ¶¶ 4-5, 14-15; *In re Goldman*

---

[4] *Available at* http://nasdaq.cchwallstreet.com/NASDAQTools/PlatformViewer.asp?selectednode=chp%5F1%5F1%5F4%5F3&manual=%2Fnasdaq%2Fmain%2Fnasdaq%2Dequityrules%2F.

[5] *Available at* https://listingcenter.nasdaqomx.com/Material_Search.aspx?cid=71&mcd=SI&sub_cid=114,109,101,97,103.

[6] Courts have generally deferred to a stock exchange's reasonable interpretations of its own rules. *See, e.g.*, *Heath v. S.E.C.*, 586 F.3d 122, 138-39 (2d Cir. 2009); *McCullagh v. Dean Witter Reynolds, Inc.*, 177 F.3d 1307, 1309 (11th Cir. 1999); *Schultz v. S.E.C.*, 614 F.2d 561, 571 (7th Cir. 1980); *Fogel v. Chestnutt*, 533 F.2d 731, 753 (2d Cir. 1975); *Intercont'l Indus., Inc. v. Am. Stock Exch.*, 452 F.2d 935, 940 (5th Cir. 1971); *Moses v. Burgin*, 445 F.2d 369, 382 (1st Cir. 1971).

[7] Plaintiff relies heavily on a California case which held that the Board's prior issuance of excess awards was material to a subsequent shareholder vote to amend an incentive plan. *See St. Louis Police Retirement Sys. v. Severson*, Case No. 12-CV-5086 YGR, 2012 WL 5270125, at *4-6 (N.D. Cal. Oct. 23, 2012). This case is distinguishable from the present circumstances because there was no indication that the board of directors in *Severson* had broad authority to amend the terms of the plan. Most of the remaining cases cited by Plaintiff in his briefs are distinguishable because they generally involved allegations that the Board "spring-loaded," backdated, or otherwise manipulated the grant of equity awards to directors and officers. *See, e.g.*, *Weiss v. Swanson*, 948 A.2d 433, 439-40 (Del. Ch. 2008); *In re Tyson Foods, Inc.*, Civil Case No. 1106-CC, 2007 WL 2351071, at *1 (Del. Ch. Aug. 15, 2007). There are no such allegations directed at the GenVec Defendants.

*Sachs Grp. Inc. S'holder Litig.*, Civil Action No. 5215-VCG, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011) (setting compensation appropriate "to retain and incentivize employees, both individually and in the aggregate, is a core function of a board of directors exercising its business judgment"). While Plaintiff may ultimately succeed on the merits, the Court is not convinced at this stage of the proceedings that the identified omissions are material in the context of the November 22, 2013 shareholder vote.

> B. <u>Irreparable Harm in the Absence of an Injunction</u>

"The threat of an uninformed stockholder vote constitutes irreparable harm." *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262 (Del. Ch. 2003). "It is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected." *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del. Ch. 2001). In the circumstances of this case, the irreparable harm factor largely overlaps with the analysis addressing the likelihood of success on the merits. Because the Court concludes that Plaintiff has failed to demonstrate a likelihood that the identified omissions in the 2013 Proxy Statement are material, the Court is unable to conclude that Plaintiff and similarly situated stockholders would suffer irreparable harm—*i.e.*, an uninformed vote—in the absence of an injunction. The Court is also not convinced that it will be unable to afford adequate relief to Plaintiff, including, for example, rescission of improper awards, in the absence of an injunction and in the event he is ultimately successful on the merits of his claims.

> C. <u>Balance of Equities</u>

The balance of equities tips in Defendants' favor. A substantial block of GenVec's shareholders have declared their opposition to postponing the November 22, 2013 annual meeting and have stated that additional disclosures regarding alleged violations of per-participant limits would have no impact on their voting decisions. Doc. Nos. 17-3, 17-4, and 17-5. There is

no dispute that GenVec, which has been and continues to be in financial distress, has already paid certain expenses in advance of the shareholders meeting, including the mailing of the 2013 Proxy Statement. Finally, in requesting a preliminary injunction, Plaintiff is not alleging that Defendants engaged in fraudulent or manipulative conduct in granting awards in excess of the annual per-participant limits. Instead, it appears that the inclusion of the lower per-participant limits in the 2011 and 2012 Proxy Statements was unintentional. In these circumstances, equitable considerations do not support the issuance of a preliminary injunction.

### D. Public Interest

Finally, the Court concludes that considerations of the public interest counsel against the issuance of a preliminary injunction. Enjoining a shareholders meeting less than a week before it is scheduled to occur has the potential to be disruptive and to create public uncertainty regarding the company.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is DENIED. A separate Order follows.

November 20, 2013                                            /s/
   Date                                       Alexander Williams, Jr.
                                                                 UNITED STATES DISTRICT JUDGE